UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO: 12-CR-20289- COOKE

UNITED STATES OF AMERICA,

v.

SARAH DA SILVA KELLER

_____/

## DEFENDANT'S SENTENCING MEMORANDUM AND REQUEST FOR VARIANCE FROM THE ADVISORY SENTENCING GUIDELINES AS CALCULATED IN THE PSI

Defendant Sarah Keller, by and through undersigned counsel, respectfully asks this Court to impose a non-guideline sentence based on the factors set forth in 18 U.S.C. § 3553(a). For reasons stated herein, Ms. Keller submits that a variance from the PSI's proposed guideline sentence of 30-37 months should be granted and a sentence of house arrest should be imposed.

## PROCEDURAL FACTS AND PLEA AGREEMENT

On June 27, Ms. Keller entered into a plea agreement with the government and pled guilty to the offense of conspiracy to commit healthcare fraud, in violation of Title 18, United States Code, Section 1349. Pursuant to the plea agreement and its conditions, the government agreed that a guideline range of 30- 37 months is an accurate calculation of the guidelines. A Pre-Sentence Investigative Report (PSI) was completed by probation, which recommended an advisory guideline range of a level 19 with a corresponding range of 30-37 months. Ms. Keller filed her objections to this PSI [DE 22], but those objections did not effect the guideline calculation. Through the amended

PSI all objections have been resolved.

## SENTENCING POST-*BOOKER*

In *Booker*, the Supreme Court held that the Sentencing Guidelines are no longer mandatory and constitute only one of the sentencing factors that the Court must consider under 18 U.S.C. § 3553(a).  *United States v. Booker*, 125 S. Ct. 738, 757 (2005).  Under *Booker,* sentencing decisions are subject to a "reasonableness" standard of review which must be measured against the factors outlined by Congress in Section 3553(a).  *Id.* at 761.  Moreover, a sentence outside the advisory guideline range does not need to be justified by "extraordinary circumstances."  *Gall v. United States*, 128 S. Ct. 586 (2007).  Indeed, the Supreme Court has specifically rejected any presumption of unreasonableness for sentences outside the guideline range.  *Id.* at 595.

Under *Gall,* the district court must impose a sentence that is both procedurally and substantively reasonable. *Id.* at 597; *United States v Ireke*, 2008 WL 862694 (11th Cir.). In order to impose a sentence that is procedurally reasonable, the district court must correctly calculate the advisory guideline level, treat the guidelines as advisory and not mandatory, consider all of the statutory factors contained in 18 U.S.C. § 3553(a), make correct factual findings and provide an adequate explanation for the sentence imposed. *Gall,* 128 S. Ct. at 597.  If a sentence is procedurally sound, it may only be overturned if an appellate court determines that it is substantively unreasonable after considering the totality of the circumstances under an abuse of discretion standard.  *Id.* at 597; *United States v. Pugh*, 515 F.3d 1179, 1191 (11th Cir. 2008).

In fashioning a sentence that is substantively reasonable, the district court has considerable discretion as to the weight it decides to give to each of the 3553(a) factors. *See United States v. McBride*, 511 F.3d 1293, 1297-98 (11th Cir. 2008)(noting that disagreement with how the sentencing court weighs certain factors is insufficient to reverse a procedurally reasonable sentence). Under *Gall*, the Court must consider all of the § 3553(a) factors and "make an individualized assessment based on the facts presented." *Gall*, 128 S. Ct. at 597. The Eleventh Circuit has advised that "after it makes [its] guideline calculation, the District Court may impose a more severe or more lenient sentence as long as the sentence is reasonable." *United States v. Crawford*, 407 F.3d 1174 at 1179 (11th Cir. 2005); *United States v. Williams*, 456 F.3d 1353, 1363 (11th Cir. 2006). The sentence imposed must be "sufficient but not greater than necessary" to achieve the four purposes of sentencing outlined in § 3553(a)(2). *United States v. Adelson*, 441 F. Supp. 2d 506 (SDNY 2006)(finding the mechanical application of the advisory sentencing guidelines in a fraud case where losses totaled $260 million would produce a sentence far greater than necessary for punishment under § 3553(a)). Thus, after considering the specific facts of a case, there are many instances where a guideline range will not result in a reasonable sentence. *United States v. Hunt,* 459 F.3d 1180, 1185 (11th. Cir. 2006)("[t]here are . . . many instances where the Guideline range will not yield a reasonable sentence").

Here, the strict application of the advisory sentencing guidelines produces a sentence greater than necessary for punishment under § 3553(a). As set out below, the applicable sentencing factors set forth in 18 U.S.C. § 3553(a) justify a variance from the advisory guideline sentence.

## ANALYSIS OF THE SENTENCING FACTORS IN § 3553(a) SUPPORTS A VARANCE

Many people argue for a variance under *Gall*, because *Gall* supports the proposition that a variance does not need to be supported by extraordinary circumstances. *Gall v. United States*, 128 S. Ct. 586 (2007).   However, *Gall* supports a variance for Sarah Keller based upon the extraordinarily similar facts as well.

In *Gall*, the defendant was a 21 year old drug-using college student who joined an on-going conspiracy to distribute ecstacy. For his participation he netted over $30,000 in drug money.  However, after 7 months, he voluntarily withdrew from the conspiracy and lived a law-abiding life ever since.  He turned away from that life of crime and the profit it promised him. He took a lower paying job, completed his education and worked lawfully for many years without any interaction with the law.  A couple of years later he was approached by law enforcement where he admitted his conduct.  When he learned of the indictment almost 3 ½ years after he withdrew from the conspiracy, he self-surrendered and pled guilty. *Id*.  At sentencing, the government did not dispute the letters and testimony from family members and business associates who testified to Gall's character and work ethic.  *Id*. The court specifically relied on Gall's withdrawal from the conspiracy almost four years before the filing of the Indictment, his post-offense conduct, especially obtaining a college degree and the start of his own successful business, the support of family and friends, lack of criminal history, and his age at the time of the offense conduct in sentencing him to 36 months of probation instead of the 30-37 months of incarceration as recommended by the Guidelines.  *Id*. at 593.

As discussed below, the very facts the Supreme Court of the United States relied upon in upholding a variance from a guideline sentence of 30-37 months to 36 months of probation are present for Sarah to an even greater degree.  Therefore, a variance is supported due to the personal history and characteristics of Sarah Keller and her post – offense behavior.

### A.  HISTORY AND CHARACTERISTICS OF MS. KELLER.

Sarah Keller has not had an easy life.  Yet, throughout her struggles she has remained a positive and contributing member to society, save her minor involvement in the instant offense.  Her perseverance in the face of her struggles confirms that she is a loving mother and wife as well as a needed member of society.  She has used her own struggles to assist and build up the members of our society who are most disadvantaged and needy.

Sarah grew up in a family dedicated to church and public service, and she has continued that commitment to serving her community with her own nuclear family.  Her parents used to take her and her siblings to feed the homeless, visit the sick in hospitals, and the elderly in nursing homes. She was raised to be very humble and grateful for what she had.  She, in turn, takes her children to feed the homeless and visit those most in need of encouragement and a kind word.  Exhibit A, composite photos of Sarah with her family and friends feeding the homeless. She also continues work with disadvantaged individuals through her church by dedicating her time to assist with her church's recovery programs, lending her new educational training and experience to make the program more effective for those individuals it serves. Exhibit B, letter from Pastor. Such

commitment to our community is not a newly developed behavior since her arrest but something to which she has been dedicated since childhood.

In addition to being raised with an appreciation for her blessings and her responsibility to serve her community, Sarah grew up with an understanding of the social impact and hardships faced by individuals suffering from physical, emotional and mental disabilities.  Growing up, Sarah was moved to ESE classes in school due to a learning disability. Through her own struggles with her disability, she developed an understanding of the social impact such a label causes and developed a great empathy for others who have disabilities. Eventually, these experiences are a part of what lead her to her current profession, a program counselor for those with mental health disabilities and/or substance abuse addictions.

However, Sarah's road to her current profession was not easy and further instilled in her the necessary empathy required to help those she serves.  In 1997, when Sarah was 14 years old, her mother took all the children, including Sarah, and moved them back to Brazil to be reunited with her father.  When they arrived, they all lived in her grandmother's efficiency as her family was poor and did not have many resources. It was a culture shock to her to see so much poverty and filth in the streets.  It further cemented Sarah's appreciation for the blessings she had and of the need to contribute to those who are less fortunate.

After a year of living in Brazil, Sarah convinced her parents to allow her to move back with her aunt in Miami. She was having difficulty in the educational system in Brazil and wanted to complete her schooling in Miami. So, at the age of 15, Sarah left her parents home to live with her aunt who already had three kids. In order to help support

her Aunt and her family, Sarah has worked ever since she started the 9th grade.  At that age she was responsible for paying rent to her aunt and for purchasing all her toiletries and clothing as well as any other necessities for school.  She maintained this employment while struggling through her classes and coping with her own learning disability.

Being solely responsible for supporting herself made being away from her parents and family extremely difficult.  She was very close to her mother as her mother was the one constant in her life while growing up.  As such, when Sarah met her first boyfriend, his mother took on the role that her actual mother was unable to due to her being in Brazil.  Sarah became very attached to her.

At 17 years old, she became pregnant with her first child.  While pregnant she continued to go to school and work. In order to have the most stable environment for their growing family, Sarah moved in with her boyfriend and his mother.  Sarah was looking forward to the birth of her child and doing the best to build a strong family.

However, on March 19 of 2002, while she was pregnant, Sarah's life began to crumble around her.  She came back from school and was told that her mother died in Brazil. Her mother suffered from a serious asthma condition and died from a cardiac arrest from an overdose of albuterol, which occurred from a hospital's attempt to control her asthma attacks.  Due to Sarah's pregnancy, she was unable to travel to Brazil and was unable to attend her mother's funeral.

After her mother's passing Sarah became very depressed and began to suffer panic attacks.  Due to her health condition, her pregnancy, and her absence upon her mother's death, Sarah missed too many days of school and was forced to leave school. During her 6th month of pregnancy, Sarah went to the hospital reporting some

abnormalities.  The nurse sent her home without doing an exam.  Later that night, her contractions started and she was taken to another hospital.  She had also developed an infection due to the treatment she had received at the previous hospital visit. This infection was also affecting the baby. Sarah was forced to go through an entire labor and delivery.  Her daughter was born that night and died a few minutes later.

Having lost her mother and her baby in a span of a few months, Sarah's depression worsened.  However, little by little Sarah pulled herself out of her depression. She depended greatly on her boyfriend's mother who had become her surrogate mother. However, 6 months after the loss of her daughter and her own mother, Sarah went to check on her surrogate mother who had cardiac problems. When Sarah checked on her, she could not wake her up.  She rolled her over and saw that her lips were blue and she was not breathing. She immediately called 911 and helped with CPR. However, she was ultimately pronounced dead from a clogged artery.

In less than one year and at the age of 17, Sarah suffered these three deaths of the people with whom she had formed her closest relationships.  Despite this, Sarah continued with her belief in family and commitment to her community.  She remained with her boyfriend for three more years at which point she gave birth to a healthy baby boy, Nathaniel Manuel Suarez. She and her boyfriend were engaged to be married and were moving forward. At the same time, Sarah obtained her GED and remained committed to furthering her education and her ability to contribute to her family and society.

Just after her son's first birthday and while she was visiting her father in Brazil for the first time since her mother's death, her fiancé called and told her that he was

leaving the relationship.  She was told this while waiting for him to pick her up from the airport for over an hour. Sarah realized that she and her son were truly on their own.  She was at the airport with no money and no phone to call anyone for help.  She had been at the airport for over 4 hours with a one year old before finally able to contact someone for a ride to what she hoped was still her home.

Upon arriving at the only home she knew, she realized that she was being told her needed to leave that very day.  She was unemployed with a one year old and needed to find a job.  She had no car, phone, or means of income. Sarah could have given up or lived off of government assistance, but she did not.  Instead, she persevered by remaining true to her dedication to hard work and providing for her family. Thankfully her aunt allowed her and her son to stay in her home and she immediately found work in a daycare where her son was able to stay while she worked.

While continuing to pursue her education by enrolling at Keiser College for her Associates Degree, she continued her employment at the daycare and then moved into a position as a teacher's aide for a class of students with learning disabilities, something with which Sarah had personal experience. Unfortunately her salary was not sufficient for a single mom who was not getting any child support.  At this point, her aunt told her that Manny Gonzalez, for whom she did housekeeping, needed a receptionist at his business, Health Care Solutions Network (hereafter HCSN). He offered Sarah a little more than she was making as a teacher's aide. Therefore, after a short interview, Sarah was hired and began work immediately as the receptionist. She did not really know what type of services were supposed to be provided at the office or really anything about the mental health field.  In her complete lack of experience, that office was her only point of

reference as to how things were to be done.

During this time at HCSN, further set backs occurred for Sarah making her focus not on her job but on surviving. She was injured in a car accident and was in a wheel chair for a period of time while still solely responsible for her son. Her son, now 2 years old, was also hospitalized with bacterial pneumonia.  This was especially concerning as both Sarah and her son have chronic asthma, the same condition which caused her mother's death.  Additionally, her son's father was providing no support and was becoming quite difficult to deal with.  He is now over $18,000 in arrears in child support. Sarah again sank into a depression.

However, she was again blessed to have supportive people around her, including members of her church, and she persevered instead of continuing her involvement in illegal activity.  For reasons described below, Sarah voluntarily left her employment at HCSN for a different receptionist position.  She began working at a community mental health center as a receptionist for the out-patient program. At the same time, she was moving forward with her B.A. in Psychology from Nova Southeastern University.  With this new employment and her growing understanding of the appropriate treatment for mental health and addiction from her education, she was able to observe how a true community mental health center operated and how different it was from HCSN. Although she had no responsibility or involvement with the PHP side of the center, she was able to see the difference from HCSN.

Through her education, employment in the social services field, and through her church, Sarah was further encouraged to continue with her degree and to use her degree to fulfill her commitment to her family and to society in a meaningful way.   Therefore,

while continuing to serve her community and assist those in need, she went on to enroll in Nova Southeastern's Masters program in speech and language pathology where she also maintains excellent grades.  Sarah chose a focus on speech and language pathology, because it was a career that would allow her to help others and help them achieve a better way of life. She would have an opportunity to work with all age groups and with so many different disadvantaged groups.

As opposed to what she knew when she was a 21 year old working at HCSN, Sarah had now become educated and trained in the field of psychology and mental health. Importantly, she used that knowledge for the betterment of society instead of using it to take advantage of those less fortunate.  She obtained employment as a program counselor at a psycho-social rehabilitation center where she presided over a group of 12 clients. She assisted them in becoming more independent and helped them make use of the resources in the community available to them. She had compassion for her clients and learned a great deal from them as well.  She was dedicated to providing the quality of care so needed in this field with honesty and integrity.  Exhibit C, letters from co-workers. For instance, some of her client's lived in ALF's and would complain about their care in the home. She would immediately report these instances to her supervisor, encourage the clients to call the abuse lines, and follow-up with the clients about the complaints. She made sure to always report anything she felt was not right with the client, as she had their best interest at heart.  She had a curriculum that she followed where everything was noted in files and organized. She would have regularly scheduled supervision, trainings, and staffing. The clients were all in an appropriate functioning level group and if they did not meet the criteria, they were discharged. Sarah was truly a

great asset to the program and to those she served. With more education and knowledge about the field of mental health, Sarah realizes even more how her actions at HCSN helped to take advantage of people in need and the governmental programs which provide much-needed support for these at-risk individuals.

Ever since leaving HCSN, Sarah has continued to contribute to society in a lawful and productive manner.  Besides her employment she is dedicated to her church community and to assisting those in need.  Exhibit D, composite letters.  She also met and married her husband with whom she recently welcomed a new daughter into the world.  Unfortunately, her daughter suffers from Torticolis, which can affect many of a child's developmental milestones such as sitting, walking and balancing to name a few. She requires continuing physical therapy. Her son takes daily medications for his asthma and wakes up wheezing at least 3 times a week, especially during allergy season. His grades in school have dropped and he has had some behavioral issues. As recently as last week, he was rushed to the emergency room due to a severe asthma attack.  Sarah is both a needed and essential member to her family as well as the community as a whole.

**B.     POST OFFENSE BEHAVIOR AND THE NEED FOR SPECIFIC DETERRENCE FROM FUTURE CRIMINAL CONDUCT**

Generally speaking, specific deterrence of individuals is not strengthened by imposing a greater sentence of incarceration. In fact, a study on specific deterrence was conducted involving white collar offenders.  The study found that, between a sentence of probation and imprisonment, there was no difference in the specific deterrence of individuals. *See* David Weisburd et. al., *Specific Deterrence in a Sample of Offenders Convicted of White-Collar Crimes*, 33 Criminology 587 (1995).

Furthermore, the need for specific deterrence may decrease when considering a defendant's post-offense conduct. *Gall*, 128 S. Ct. 586 (2007)(finding that post-offense actions are a basis for forming a sentence that is sufficient but not greater than necessary to ensure the goals of sentencing.) In *Gall*, the Court noted the defendant's voluntary withdrawal from the conspiracy and his self-rehabilitation as the basis for the variance from a thirty month guideline sentence to a sentence of probation.  The court found that the defendant's actions established that he would neither turn back to criminal activity nor be a danger to society. *Id.* The same reasoning and factual support that existed in *Gall* allowing the Supreme Court to uphold a variance from a 30 month guideline sentence (like this case) to a probation sentence, exists in this case and to a greater degree.

Sarah voluntarily left her job at HCSN as soon as she was able after realizing that that her actions were contributing to the commission of Medicare Fraud.  Each day, others at the head HCSN location would tell Sarah which clients to mark "present" on the master client list.  Even if the clients were not physically present at the location where Sarah worked, she was told to mark them present. Sarah initially believed this meant that they were present at the second location.  One day, through her own means, Sarah discovered that a client was in the hospital but she had been told to mark them present. From that day on, Sarah attempted to quietly call around to determine whether clients were actually present or not. When she discovered that a client was not present, she started making the sheets "ABSENT" for those clients and highlighting it in yellow.  She did this even though she would get in trouble from her employers.  Sarah recognized that she should have quit her job immediately, but she did not feel that she could quit outright with no substitute means of income for her family.  Instead, Sarah aggressively began

looking for a new job while seeking to minimize the effects of what she was being asked to do.  After several months, she found a new job.  Although the new job offered lower pay and her employer at HCSN offered her a raise to stay, Sarah left.  Sarah voluntarily left HCSN specifically because of the illegal activity that was occurring there.   Since the day she left, Sarah has lived a law-abiding and productive life, contributing both the health and security of her family and society as a whole.

Unlike *Gall* who was a drug abuser and had agreed to illegal activity from the get go, Sarah has no history of illegal activity prior to her working at HCSN and she did not begin her employment with the understanding that she would be committing a crime. When she did gain such an understanding, she removed herself from HCSN at a time when she was suffering extreme economic and emotional distress. She was a single mother raising a child without support from the father and had suffered major health set backs.  Unlike other situations where an individual removes herself from criminal activity because there is an anticipation of an arrest or of being discovered by law enforcement, Sarah left because her actions were not consistent with her upbringing and her sense of what was right.  Also like the defendant in *Gall*, she left in the face of being offered more money to stay and took a lower paying job. *Id*.

In addition to voluntarily removing herself from the illegal activity, Sarah immediately returned to being a law-abiding and productive member of society.  After voluntarily leaving HCSN, Sarah continued her education in order to become a professional in the mental health field.   Like *Gall*, she successfully completed her undergraduate degree and is in the process of obtaining her master's degree. *Id*. She steadily moved into employment in her field of expertise and is regarded positively by

those with whom she has worked.  Exhibit C.

Sarah recognizes that this voluntary removal in no way absolves her of responsibility for her actions for which she continues to feel great shame and remorse. She also recognizes that she did not report her involvement and the involvement of others to the proper authorities. *Gall*, 128 S. Ct. 586 (2007)(downward departure for post offense behavior granted even when defendant failed to report the offense to the authorities after removing himself from the conspiracy).  However, Sarah's actions since she voluntarily stopped her participation in criminal activity do show her true character and that incarceration is not necessary to deter her from future criminal behavior.

In addition to remaining committed to lawfully moving forward, Sarah also assisted law enforcement from the moment she was approached about what had occurred at HCSN. See *Roberts v. United States*, 445 U.S. 552, 558 (1980)(finding that the Defendant's cooperation demonstrates that "the defendant will transgress no more and will respond to rehabilitative efforts and not deem himself at war with his society.")  She did not try to hide her behavior.  Instead, she first met with the government without counsel and several times after with counsel.  She continues to remain available to assist in truthfully answering questions about her time at HCSN.  Sarah never had any hesitancy in assisting law enforcement.  Rather, with her greater understanding of the mental health system through her education and job experience combined with her experience at HCSN, she recognizes that the disadvantaged face a great danger of exploitation. Sarah's choice to assist the government is consistent with her commitment to assist those with disabilities and with her career focus since leaving HCSN and obtaining her college degree.

Most assuredly, Sarah's arrest and prosecution have already caused a great degree of punishment.  She has already lost a job which she loved and believed she was truly able to help her community and those most in need.  She has had to cease pursuit of her masters degree in her field as, with this conviction, she will never be able to obtain employment in this area.  So, not only has Sarah already suffered a great loss, the community has suffered as well in loosing her guidance and services.

Such voluntary withdrawal years prior to her indictment and her law-abiding life since her withdrawal are a clearly recognized factors under 3553(a) and not taken into account by the guidelines.  Like the defendant in *Gall*, Sarah's post-offense conduct supports a finding that a guideline sentence is not necessary to deter her from committing future criminal conduct.

### C.  THE GUIDELINES' MAIN RELIANCE UPON LOSS AMOUNT IN CALCULATING A RANGE OVERSTATES THE DEFENDANT'S INVOLVMENT IN THE OFFENSE

Under the Guidelines, loss, more than any other factor, determines the severity of sentences in fraud cases, not the personal characteristics or grades of involvement of conspirators.  *United States v. Lamonda*, 2008 WL 68744, *9 (M.D.Fla.)  "For example, the defendant may have had a limited or inferior role in the fraud that bore little relationship to the amount of the loss; he may have had little or no knowledge of the total amount being taken, such that it would be unfair to attribute the entire amount of loss to him; or the defendant's fraud may have been for little or no gain, especially in comparison to the size of the loss." *United States v. Forchette*, 220 F.Supp.2d 914, 924-25 (E.D.Wis. 2002) (departing where defendant's gain was minimal compared to loss amount).

In *United States v. Stuart*, favorably cited by *Lamonda*, the court conducted an analysis of the guideline's loss amount in comparison with the defendant's share of the proceeds.  22 F.3d 76 (3rd Cir. 1994).  It found that the defendant's gain was minuscule compared to the total amount taken. *Id.* (defendant paid $2000 for agreeing to transport stolen government bonds, which had a value of $129,000).  While it found that the loss amount was properly computed as $129,000, it stated:

> "Nevertheless, we are left with the definite impression that, notwithstanding the proper application of the Guidelines, a nine-level enhancement under these circumstances may well overstate both the degree of Stuart's criminality and his need to be corrected. At most, Stuart agreed to deliver stolen bonds on two occasions, for a total payment of $2,000. If on remand Stuart requests a downward departure, the district court may well find there to be little relationship between Stuart's role in the offense and the value of the stolen property he was carrying."

*Id.* at 82(granting a variance even after minimal role was awarded); *United States v. Costello*, 16 F.Supp. 2d 36, 39(D.Mass 1998) (granting downward departure based on the extent of the disproportion between the loss to the victim and the gain to the defendant). Therefore, under the Guidelines' loss amount calculation, circumstances such as the length of the person's involvement and the depth of their involvement in a conspiracy, absent minor or minimal role, are not taken into consideration by the guidelines and are appropriately considered in an argument for a variance. *United States v. Lamonda*, 2008 WL 68744, citing *United States v. Restrepo*, 936 F.2d 661, 667 (2nd Cir. 1991)(concluding that downward departure may be warranted where the offense level "bears little relation to the defendant's role in the offense").

Sarah's involvement was truly miniscule, both in the amount of money received and in her knowledge of the total amount taken.  Additionally her role in the offense bore

almost no relation to the amount taken.  Due to her limited role, she had no knowledge or understanding of the approximately $2,400,000 for which Medicare was billed during her involvement.  Neither did she have any control over such billing.  At most, she gained $15 and hour for a 40-hour work week.  Even if you add up her wages for all of 2007 plus one month in 2008 (which is much greater than the time she was engaged in illegal conduct) without accounting for unpaid vacation, her pay before she paid taxes was approximately $31,000, which is truly nowhere near the millions of dollars gained by other co-conspirators.  Yet, instead of a 6 level increase under the guidelines she is charged a 16 level increase just as if she had received millions of dollars or had the knowledge that such funds were taken and the ability to control them.  The application of 2 levels for minor role does not come even close to alleviating this discrepancy. A variance on the basis that the loss amount overstates both the degree of Sarah's criminality and her need to be corrected through incarceration.

### D.    NATURE OF THE OFFENSE

In seeking a variance, Sarah is not attempting to minimize or overlook the results of her actions.  She has admitted her guilt to this Court and the government.  She has submitted a statement accepting her responsibility for the offense.  In this request for a variance, Sarah recognizes the harm caused by healthcare fraud.  She, better than others who have not committed themselves to lawfully working in the field of mental health and addiction, understands the negative impact of Medicare fraud both on society and on the individuals who depend upon such funding. She does not argue that the offense is not serious and should be taken lightly.  Rather, she brings forward arguments based upon a

totality of the circumstances and 3553(a) factors instead of focusing on just the nature of the offense.

Instead, she asks the court to recognize that the nature of the offense is not derived solely from the title or subject of the crime itself, but is also related to a defendant's own actions within that offense. The nature of *this* offense must not be overridden or outweighed by the nebulous goal of general deterrence. A defendant's role in the offense plays not only a part in calculating the advisory guidelines but in determining an appropriate sentence reflecting the individual involvement of each conspirator.

Indeed the sentencing guidelines in calculating an offense level, absent downward departures, do not consider any grading of sentences for the individuals involved as discussed in the section above.  Therefore, the nature of an offense can change depending upon an analysis of the defendant's actions and role as well as those of the other conspirators.  In fact, the Supreme Court recognized the importance of considering the nature of the specific offense *in combinat*ion with the defendant's actions.  In *Gall*, the Court recognized that the amount of proceeds obtained by the defendant and the defendant's actions have an effect on the seriousness and nature of the offense.  It held that a court "can not consider, for the purposes of sentencing, one side of the financial aspect of the offense conduct without considering the other." See *Gall,* 128 S.Ct. at 599. The court reasoned that:

> "the fact that the defendant made $30,000 can be viewed from different perspectives. On the one hand, [Gall] should be punished for profiting from a criminal scheme .... On the other hand, [Gall], who is from a working-class family and has few financial resources, decided to turn his back on what, for him, was a highly profitable venture ...."

*Id.*

Sarah is, as was the defendant in *Gall*, from a working class family. She also received money from the criminal conspiracy. However, like the defendant in *Gall*, her profit was truly minimal. If fact, after she voluntarily left HCSN for a loss in salary, HCSN re-classified her as a contract employee causing Sarah to have to pay further taxes for the money she made, just another way her co-conspirators distinguished themselves from Sarah's personal character. Additionally, like the defendant in *Gall*, she turned her back on this venture even when doing so was not in her economic interest. She even turned down an offer of more money to remain at HCSN. Therefore, although the offense outside of the context of this case is serious, that seriousness is somewhat lessened when considering the specific actions of Sarah. Those specific actions and characteristics not taken into account under the guidelines weigh in favor of a variance.

### E.    GENERAL DETERENCE

General deterrence may not be the basis for a sentence which would otherwise be greater than necessary to fulfill the goals of sentencing. *Gall,* 128 S. Ct. at 597; *United States v. Williams*, 526 F.3d 1312, 1322 (11th Cir. 2008)(although the weight to be accorded any given 3553(a) factor is within the sound discretion of the district court, unjustified reliance on a single factor may indicate an unreasonable sentence).  In fact, the theory that the severity of the sentence increases the impact of general deterrence upon the public has been completely contradicted by the majority of studies on general deterrence. See Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice: A Review of Research 28-29 (2006). This study noted, when discussing the conclusion that there is no correlation, that "Three National Academy of Science panels,

all appointed by Republican presidents, reached that conclusion, as has every major survey of the evidence." Although such an objective might be laudable, when all empirical or other evidence shows that the objective is not being achieved, a longer sentence is not justified under § 3553. *United States v. Beiermann*, 599 F. Supp. 2d 1087, 1103-04 (N.D. Iowa 2009).

Indeed, in some cases, a non-guideline sentence might actively promote respect for the law. Having a system which recognizes the individualities of each defendant based upon consideration of the totality of circumstances supports our belief in a system which effectuates "just" punishment. The Supreme Court also recognized this possibility by acknowledging the District Judge's reasoning that, "a sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing." *Gall*, 128 S. Ct. at 600. Therefore, although it is a legitimate concern that a more lenient sentence might threaten to promote disrespect for the law, such concern may be offset by recognizing the fact that other more culpable defendants will receive more significant sentences due to their roles and actions. *Id.*

Ultimately, the purpose of sentencing is to fashion an appropriate sentence for this individual, not simply impose a sentence which would deter future Medicare Fraud irrespective of the facts surrounding Sarah's actual participation in the offense. In keeping this perspective, Sarah did not commit a violent crime involving the use of weapons or guns. *See* 28 U.S.C. § 994(j) (prison is generally inappropriate in "cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense.") Moreover, Sarah did not set out to steal from the

government or participate in the growing occurrence of Medicare Fraud.  Rather, she took a low-level receptionist job without any belief that her job would require her to commit a crime. *United States v. Nachamie*, 121 F.Supp.2d 285, 295-97 (S.D.N.Y. 2000)(departing where defendants initially became involved with mastermind of scheme with honest intentions but later became involved in illegality).

Therefore, while Sarah acknowledges the seriousness of the offense of healthcare fraud and the need for sentences to promote respect for the law, a non-guideline sentence for a serious offense is not presumed unreasonable and does not always suggest disrespect for the law.  In this case, the totality of circumstances supports, and the Supreme Court itself has recognized, that a sentence below the guidelines would not only be sufficient to promote the sentencing goals as a whole, but would also be sufficient to maintain respect for the law.   Any sentence imposed should not exclude these circumstances by relying solely upon one of the goals of sentencing, deterrence and respect for the law.

**CONCLUSION**

An advisory guideline sentence as calculated by the PSI is not required to provide a sentence that is sufficient but not greater than necessary to achieve the goals of §3553(a).  Based upon all the information and arguments discussed above, Sarah Keller's post-offense behavior and her personal history and characteristics support a variance.  Additionally, the guideline's loss amount overstates the specific acts attributable to Sarah and supports a variance.  Therefore, Sarah Keller respectfully requests this Court impose a sentence below the PSI's calculated guideline range of 30-37 months and instead impose a sentence of house arrest.

Respectfully Submitted,

Brittney Horstman, Esq.
One NE 2nd Avenue, Ste. 202
Miami, FL 33132
(786) 363-2517
(786) 363-1676
bbhorstman@hotmail.com

By: /s/ Brittney Horstman
Brittney Horstman, Esq.
Florida Bar No. 604798